GLICKSTEIN, Judge.
This is an appeal from the trial court’s order, denying appellant’s motion for relief pursuant to Florida Rule of Criminal Procedure 3.850. We reverse and remand for new trial.
The crimes involved here were heinous— kidnapping and sexual battery. The three men involved were nothing short of animals in their abuse of the female victim in 1981.
The defendant here was found guilty of both crimes, based on the victim's identification, and sentenced to life on the first charge and fifteen years on the second.
On August 5, 1981, the Assistant Public Defender assigned to defend appellant filed his witness list, naming the defendant and two alibi witnesses, whose names had been given to him by the defendant — Jeffrey Snitkoff, 250 N.W. 67th Street, Boca Ra-ton, and James Brash, 338 South Ridge Road, Delray Beach, Florida. Appellant’s lawyer failed to file a Notice of Alibi, as required by Florida Rule of Criminal Procedure 3.200 [1], precluding the defendant’s use of his alibi defense as well as his alibi witnesses at the October, 1981 trial. Later, in his 1981 petition for writ of habeas corpus, while an unsuccessful appeal to this court was pending, in which he alleged ineffective assistance of counsel, appellant claimed the following:
When Public Defender, Lawrence Duffy, first came in contact with me, which was approximately three weeks after I was arrest [sic] and incarcerated, I had informed him of my alibi and the names and addresses of my witnesses. He then instructed me to speak to no one about my case and left. It was then, approximately, one month after the first visit that he came in contact with me again, when I then asked my counsel if he had filed subpeona’s [sic] for my witnesses.
My counsel informed me that he had not filed subpoena’s [sic] for my witnesses because he had not yet received a bill of particular from State Attorney Morgan. I then demanded of my counsel to *683 subpoena my witnesses and he said that he would do so. As the months went by, I had seen my counsel on several different occaisons [sic] and on each and every seperate [sic] occaision, [sic] I had asked my counsel if he had filed subpeona’s [sic] for my witnesses and he had informed me that he had not done so. Then, at the day of the trial, my counsel informed me that he did in fact file sub-peona’s [sic] for my witnesses and that his investigaters [sic] were out looking for the witnesses. My witnesses still did not appear at the trial and the trial concluded to a virdict [sic] of guilty. It wasnt [sic] until after the trial when my counsel had told me that he was late in filing subpeona’s [sic] for my witnesses, and when my counsel finally did subpeo-na [sic] the witnesses.
The petition was denied by the trial court in 1982; and this court affirmed the denial in 1984.[2] It is now 1986; and the defendant’s complaint is the same. However, at this late date, who knows where the victim may be to testify for the state or the alibi witnesses for the defense?
While the trial judge who heard the current motion in 1985 concluded the performance of the public defender fell below the necessary standard in two respects, he also concluded that the defendant failed to show the necessary kind of prejudice required by Downs v. State, 453 So.2d 1102 (Fla.1984) and State v. Bucherie, 468 So.2d 229, 231 (Fla.1985).[3] We disagree.
This is not a case in which a disinterested eyewitness identified the defendant as the ravaging assailant. The victim, as in so many of these sexual battery cases, is the only person who can identify her attackers. Those disposed to sexual battery normally do not sexually attack women at high noon in Times Square or other times and places where witnesses can assist the victim. If there are other persons present, it is often more of the attackers.
There were then, as there often are, real questions of identification in this case — the presence or absence of a tattoo on the attacker’s hand and red spot in his eye as well as the ethnicity of the defendant— Spanish or Oriental. These questions, without the presence of alibi witnesses, may be an entirely different picture than with them, perhaps not. The defendant was entitled to present the defense he claimed to have.[4] Even the trial judge who presided over the jury trial suggested to the victim at the defendant’s sentencing in 1982 that she view a live lineup to be sure of her attacker’s identification.
What is more, defense counsel did not let his client testify about his alibi. He only allowed him to testify that he did not commit the crime and other matters relating solely to identity. The ineffectiveness was thus compounded, it apparently being defense counsel’s fear that the state would pounce on his client by arguing that if the defense had an alibi, his witnesses would be present at the trial.
We cannot accept the trial court’s reasoning in this case on the point of prejudice. As late as it is to attempt a retrial, this defendant was entitled to a trial with his witnesses present and testifying. It hardly seems appropriate for us to damn him in 1985 for his not having them available to testify at his 3.850 hearing[5] at which the *684 defendant testified as to his alibi defense and the availability of the alibi witnesses to testify at the trial in 1981, or for our not having a proffer from 1981 when his trial counsel failed to arrange for their presence and testimony at trial.[6] The defendant is in a Catch 22 by requiring him to tell us what his trial counsel should have presented. The error is compounded by the absence of any effort by appellate counsel on the original direct appeal to raise the issues now before us.
As we said earlier, the trial judge who heard the current motion found two instances of defense counsel’s failure to meet the standards required by Knight v. State, 394 So.2d 997 (Fla.1981) and Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
The second involved the failure of defense counsel to elicit successful impeaching testimony of Detective Landi, who testified for the state in its case in chief, when the impeachment resulted in the trial judge’s reversing his ruling upon the admissibility of photographs used in a photographic lineup, and in rebuttal, when he testified that he saw the defendant three months after the incident, at which time the defendant had a red spot in his eye. The defendant denied such red spot; but the victim testified he had one. We need not speculate on the effect of this omission by counsel and comment upon the finding in 1985 by the trial court that the omission did not reach the plateau of “probability” to affect the outcome. We can say that it was another nail in the defendant’s coffin.
We are frustrated for the victim in this case, who should have been spared by the system from the experience of a retrial, reliving the horror five years after the first trial. Moreover, the record shows that even if subsequently found innocent of this charge, there is a federal detainer for yet another charge against the defendant — a convicted felon even before the 1981 trial here. On retrial, the jury may again find this defendant to be one of the individuals who kidnapped, pawed over and battered the victim. But what if his alibi witnesses could have convinced the jury that he is not? The test of “probability” to establish prejudice surely is more than possibility but less than certainty.
The writer of this opinion believes that he would be useless as a field hand without calloused hands or as a judge if he felt his decision reflected a calloused heart. The existence of the former is an objective reality. The latter is completely subjective. Each of us judges must answer to our individual conscience in the exercise of informed judgment. We often disagree because judicial judgment can be so subjective. Thus, justice has always been materially subjective. Individual values plus enough votes equal a majority appellate decision. It will always be the same. Even if judges are replaced by computers, the parties involved will still be subject to the subjective human element of “garbage in; garbage out.”
ANSTEAD, J., and GODERICH, MARIO P., Associate Judge, concur.

. The record of the trial reflects dialogue between the prosecutor and defense counsel that further aggravates the situation in which the defendant now finds himself. Defense counsel stated he was waiting for a statement of particulars before filing such notice. Yet he made no motion for continuance and simply abandoned the alibi defense, relying solely on the defenses of denial and misidentification.

. The denial was without prejudice and was occasioned by the direct appeal then being before this court.

. At the hearing on the defendant’s 3.850 motion, a disinterested expert criminal defense attorney testified that in his opinion the omissions of trial counsel occasioned the defendant prejudice. The state produced the prosecutor who tried the case. His contrary opinion was admitted at the hearing.

. The jury retired sometime around 11:00 A.M. At 1:25 P.M. the trial court reconvened as the jury wished to hear the victim's testimony about the defendant’s tattoo, physical identification and speech pattern. The jury was brought in, heard the testimony and brought back a verdict 30 minutes later. The defendant had no tattoo and there was much said about the question of the attackers’ nationality.

. The record shows that the defendant’s present counsel made the appropriate efforts to have the alibi witnesses served. Service on one of the witnesses was close in that his sister-in-law was served.

. The record shows that the defendant’s trial counsel made no timely effort to subpoena the alibi witnesses. The praecipe for one of the witnesses was filed on October 19, 1981 for a trial scheduled the following day. There is no record of another praecipe or of any subpoena for either.