507 So.2d 1122 (1987)
Floyd G. WILLIAMS, Appellant,
v.
STATE of Florida, Appellee.
Nos. 85-1352, 86-62.
District Court of Appeal of Florida, Fifth District.
April 2, 1987.
Rehearing Denied June 1, 1987.
Thomas M. Jaworski, Florida Institutional Legal Services, Inc., Gainesville, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Ellen D. Phillips and Joseph N. D'Achille, Jr., Asst. Attys. Gen., Daytona Beach, for appellee.
COBB, Judge.
Floyd Williams appeals from the denial of his 3.850 motion, after a hearing in the trial court (Appeal No. 85-1352), and from denial of his petition for writ of habeas corpus to obtain a belated appeal (Appeal No. 86-62), contending that his trial and *1123 appeal were fatally flawed by his attorneys' failure to object to, and present on appeal, the improper admission of a collateral crime under the Williams Rule.[1] Because both proceedings involved the same incident, we sua sponte ordered them consolidated for purposes of disposition by this court. After reviewing the record and briefs in both cases, we reverse the denial of Williams's 3.850 motion, rendering moot the belated appeal.
Williams was involved with two women, Lola Wilson and Vivian Shingle, whom he picked up at a bar in East Palatka known as the Pine Street Inn, shortly before midnight on Thursday, May 1, 1980; they had planned to "smoke a joint" together. These initial facts are not in dispute. Thereafter, according to the state's version, Vivian went directly home from the bar, and Williams drove away with Lola, stopped at an all-night fruit market in East Palatka, and thereafter forcibly raped her in a wooded area in east Putnam County; the next night he picked up Vivian, and raped her in a similar fashion. Williams's version, on the other hand, was that he drove away from the Pine Street Inn with both women on the evening of May 1, 1980, and the three of them went together to the East Palatka Fruit Market to buy cigarettes; later in the evening, he was assaulted and robbed of his wallet and marijuana bag by the two women, who then fabricated the rape accusation as a cover-up. See Williams v. State, 447 So.2d 442 (Fla. 5th DCA 1984). Williams was tried and convicted of the kidnapping and sexual battery of Lola Wilson. He was sentenced to 100 years' imprisonment, with the trial judge retaining jurisdiction over 33 1/3 years.
The issue on this appeal, raised by Williams's 3.850 motion[2] and the evidentiary hearing thereon, is whether his appointed trial counsel was effective in light of a record that reflects virtually no pretrial investigation and a determination to present no witnesses at trial, all in the name of preserving rebuttal during closing argument. Trial counsel even advised Williams not to testify, which would have meant the state's version of events was uncontradicted. Trial counsel also declined to depose the alleged rape victims prior to trial, ostensibly in order to retain a tactical surprise examination. A trial strategy to do nothing, contrary to the dissent, is not an acceptable one.[3]
There was no physical evidence that either Lola Wilson or Vivian Shingle was assaulted or raped.[4] The only evidence that Lola was raped was her own testimony. Lola's first report to the police about the incident stated that Williams had accused her of stealing drugs from him and had threatened her. She did not mention any sexual battery. In addition to the deputy who took Lola's first complaint, there were two other persons known to defense counsel, prior to trial, to whom Williams complained, "The girls ripped me off," prior to any mention of rape by Lola or Vivian  indeed, prior even to the alleged rape of Vivian. Valerie Hall (Williams's sister) and her husband, Donald, would have so testified had they been asked. Further, Valerie would have testified that after Lola's initial complaint to the police which did not mention rape, Valerie went to see Lola and asked her to drop the charges against Williams. Lola agreed, saying Williams was a nice guy, but he must stop threatening her. Again, Lola said nothing about having been raped. This solid testimony, which would have corroborated Williams's version of the events on Thursday night, *1124 was not presented to the jury, through what we must conclude was neglect or oversight on the part of defense counsel.
Moreover, Williams's trial counsel, by his own admission, never went to the Pine Street Inn or any other location to seek available witnesses. There were available witnesses frequenting the Pine Street Inn who could testify that Lola and Vivian had established reputations for violence and aggressive behavior, which supported Williams's version of the incident. See section 90.404(1)(b)1., Florida Statutes (1979), which provides that evidence of a pertinent character trait of a "victim" offered by the accused is an exception to the general rule of inadmissibility.[5] In fact, our earlier opinion in this very case ordered the evidentiary hearing now on review and observed that the 3.850 motion prepared for Floyd Williams by Attorney Cary had sufficient specific allegations, as required by Meeks v. State, 382 So.2d 673 (Fla. 1980), "indicating that facts could (and should) have been discovered via pretrial preparation in regard to impeachment of the two `victims,' their reputation for violence (emphasis added), and a witness who saw both victims with the defendant on the night in question at a time when the state contended he was alone with only one of them." Williams at 443. Despite this court's express determination in Williams that this reputation evidence was relevant, at the required evidentiary hearing the trial court excluded it as irrelevant and inadmissible, and even refused a proffer of such evidence. Illustrative of that improperly excluded evidence is the affidavit of Andrew Betts:
Both women are fighters. They believe in cutting. I have seen "L" [Lola] fight larger men than Floyd, a couple of times, at the bar. Everyone knows she is not a pushover. If you do her wrong, you will have to prove yourself. Most people do not associate with them. They are tough women.[6]
The absence of evidence at trial as to the reputations of Lola and Vivian was crucial. It allowed the prosecutor, on closing argument, to attribute the inconsistencies in Lola's account of the incident to her timidity and embarrassment at the nature of the offense; therefore, she was "reluctant to go into specifics concerning a sexual act which violated her very privacy and decency and integrity." The trial court's finding that trial counsel could not have found essential witnesses even had he bothered to look for them is singularly unpersuasive in view of the relative ease with which they were located by Attorney Cary in preparation of the 3.850 motion.[7]
We conclude that this record establishes that Floyd Williams was convicted of kidnapping and rape as the result of ineffective assistance of counsel, which is evidenced by the omissions of trial counsel herein identified and which fall outside the wide range of professionally competent assistance. Absent these omissions, there is a reasonable probability that the outcome of Williams's trial would have been different. *1125 See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Knight v. State, 394 So.2d 997 (Fla. 1981). See also Marks v. State, 492 So.2d 681 (Fla. 4th DCA), review denied, 500 So.2d 545 (Fla. 1986); Gordon v. State, 469 So.2d 795 (Fla. 4th DCA), review denied, 480 So.2d 1296 (Fla. 1985). Had corroborating testimony been offered at trial to bolster Williams's defense, even if only that of the Halls and the deputy, we conclude that "the decision reached would reasonably likely have been different." Strickland, 466 U.S. at 696, 104 S.Ct. at 2069.
Our concern here is not the protection of criminal defense lawyers from post-trial attack; it is to enforce the guarantee that every defendant  even one who is poor and black with a prior criminal record of theft  receives a fair trial. Floyd Williams did not get one. In effect, he was sentenced to life imprisonment for possessing marijuana in Putnam County while on parole.[8]
Although our determination herein in regard to the appeal of the 3.850 motion renders moot the belated appeal, we would observe, for purposes of any subsequent trial below, that the testimony of Vivian Shingle, whatever its credibility, would be admissible either under the Williams Rule or as impeachment.[9]
REVERSED FOR NEW TRIAL.
SHARP, J., concurs.
ORFINGER, J., dissents with opinion.
ORFINGER, Judge, dissenting.
The majority has effectively usurped the function of the trial judge as trier of fact in the 3.850 evidentiary hearing,[1] and for that reason I disagree with the result. Additionally, the majority has second-guessed the strategy of trial counsel and has concluded that it would (and probably could) have handled the case better, but to grant a new trial based on that conclusion runs contrary to the legal principles which govern the issues of ineffectiveness of counsel.
In Songer v. State, 419 So.2d 1044 (Fla. 1982) the defendant argued that his trial counsel was ineffective because he had failed to call available witnesses regarding defendant's drug usage. In rejecting this contention, the court said:
As further evidence of inadequate representation, appellant notes that no witnesses were called to testify regarding his drug usage. He lists several people, including his companion at the time of the killing, whose testimony supposedly could have been used to assert a defense of impaired mental condition resulting from extensive drug use. Appellee responds, and we agree, that appellant's trial counsel avoided such testimony for tactical reasons, obviously did not believe that a voluntary intoxication defense would be effective, and probably feared the type of information which might be disclosed on cross-examination of the suggested witnesses. We will not use hindsight to second guess counsel's strategy, and so long as it was reasonably effective based on the totality of the circumstances, which it was, it cannot be faulted. See Meeks v. State, 382 So.2d 673 (Fla. 1980). That the strategy did not prove successful, from appellant's point of view, does not mean that the representation was inadequate.
Id. at 1047. See also Magill v. State, 457 So.2d 1367 (Fla. 1984); McNeal v. State, 409 So.2d 528 (Fla. 5th DCA), rev. denied, 413 So.2d 876 *1126 (Fla. 1982), (courts should not second-guess trial counsel's unsuccessful discretionary or judgmental act, or positions, whether tactical or strategic, in an inquiry as to effectiveness of counsel).
Sub judice, the trial court considered the evidence presented at the hearing, and concluded that the defendant had not demonstrated ineffectiveness under the standards enunciated in Knight v. State, 394 So.2d 997 (Fla. 1981) (later restated in Jackson v. State, 452 So.2d 533 (Fla. 1984)[2]), that
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Continuing to discuss Strickland v. Washington, the Jackson court continued:
To further explain the appropriate test for proving prejudice, the Court then held that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. 104 S.Ct. at 2068.
Jackson, 452 So.2d at 535.
In Strickland v. Washington, after stating the test for ineffectiveness, the Court cautioned that
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation omitted]. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michael v. Louisiana, supra [350 U.S. 91] at 101, 100 L.Ed. 83, 76 S.Ct. 158 [at 164]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.
466 U.S. at 689, 104 S.Ct. at 2065.
The majority interprets the evidence[3] differently than did the trial judge at the 3.850 hearing, but in my opinion, as in the trial court's opinion, the defendant did not meet his burden of showing that, but for his counsel's alleged unprofessional errors, "the result of the [trial] would have been different."
The majority places great emphasis on the fact that Valerie Hall, defendant's sister, was not questioned about a conversation she had with Lola in which she asked Lola to drop the charges and in which Lola made no mention of having been raped. It is the majority's contention that this testimony, had it been given at trial, could have affected the result. What is not mentioned is the fact that Lola, as the State's first witness, had already admitted, on cross-examination, that she had not initially told either the police or Valerie Hall that she had been raped (and the police officer confirmed *1127 this in his testimony) and that she had not sought any medical assistance. Her explanation for this omission was that she was embarrassed and humiliated by the occurrence. Whether or not the majority believes this explanation is not important. What is important is the fact that the jury apparently believed it. In the face of this admission, Valerie Hall's testimony would have been cumulative, and would have added nothing to what Lola had already admitted. Moreover, Valerie Hall testified that her brother and Lola (whom she had never met before), had come to her house early in the morning after the alleged rape, and that Lola was limping. Notably, she did not see Williams' alleged head injury. After some conversation, Lola and the defendant left the house, only to return about 20 minutes later after Valerie had gone back to bed. Lola appeared in Valerie's bedroom and asked if Valerie would take her home. Wondering why her brother didn't take Lola home, Valerie put on a housecoat and got her car. As they drove to Lola's destination, Valerie noticed that her brother was following in his car. He then pulled in front of Valerie, and stopped. Valerie stopped also, and as the defendant walked back to her car, Valerie noticed that Lola was extremely nervous. She asked Lola if she was afraid of Williams, and receiving an affirmative answer, suggested that Lola lock the car door on the passenger side so that Williams could not get in on that side. It is understandable that defense counsel did not want to give Valerie a further opportunity to hurt the defendant's case. The trial court found
that counsel did not fail to consider and develop evidence that the victims did not claim at an early stage that they had been raped. Counsel found and employed exactly that evidence in the victims' voluntary statements to the police; in the police reports and other discovery materials; and in the deposition and trial testimony of the defendant's sister, Mrs. Hall. On the basis of that evidence, he constructed his defense theory of reasonable doubt, which he employed effectively at trial. That the strategy did not prove successful, from defendant's point of view, does not mean that counsel's representation was inadequate.
The evidence supports that finding.
There were three other persons who, according to the defendant, should have been called as defense witnesses at the trial. The trial court observed that their testimony would not have helped the defendant, making these findings:
(f) The court finds that counsel did pursue the matter of a witness who saw the defendant with both victims on the night he was allegedly only with one, to the extent that he perceived the facts to be relevant and useful to the defense he adopted as his trial strategy. Three persons fall into this category:
(1) Thomas D. Cooper testified at the hearing that he saw and spoke to the defendant across the street from the Pine Street Inn, and that he brought the two victims over to the defendant's car, and then he left. Counsel testified that this information was revealed to him in discovery materials, and that such testimony would be neither useful nor relevant to the defense because this encounter took place much too early to have any connection with the assault made upon him by the victims. For that reason he did not pursue the matter.
(2) The defendant furnished to counsel the name of Harley Crooms as a person he saw later that evening gambling. Apparently defendant implies that the witness saw him with both victims at that time and place. However, this witness testified at the hearing only that when he saw the defendant in May 1980 in East Palatka, the defendant told him that the two victims "ripped him off." He said nothing about having seen the three together at any time. Counsel testified that he did not contact Mr. Crooms prior to trial because the witness had not seen the defendant with the two victims at a time material to the defense.
(3) The defendant also told counsel that he might have been seen with the two victims by a clerk at the East Palatka Fruit Market, where he took both of them to buy cigarettes. Counsel testified *1128 that this event took place at a time not material to the defense.
With respect to these witnesses, as in other matters, counsel stated that his trial strategy in this case precluded the use at trial of witnesses whose testimony would be of little or no probative value, at the cost of losing his right to opening and closing argument to the jury. The court finds that the defendant has failed to carry the burden to show that these specific omissions or overt acts were a substantial and serious deficiency measurable below that of competent counsel. Counsel's actions in this regard were reasonable under prevailing professional norms at the time of counsel's conduct, and consistent with an effective trial strategy based on the circumstances of the case.
David Ellerby and Andrew Betts submitted affidavits in support of the 3.850 motion which alleged, in substance, that they knew about the propensities for violence of both Lola and Vivian, and that had they been located and asked about this, they would have talked. Ellerby did not testify at the 3.850 hearing. Perhaps he was not as easy to find as his affidavit indicates. Betts did testify, and it is obvious to me that he was completely discredited as a witness and that his testimony (as well as his affidavit) was not considered credible by the court.
At the hearing, Betts admitted that the allegation in his affidavit that he had had sex with both Lola and Vivian was untrue. On cross-examination, he testified that he had tried to have sex with both the women, that they had promised that they would, that they made him spend his money on them and then left him with the promises unfulfilled. He admitted that he knew nothing about the Williams case, only about the girls, and also that he had been convicted of felony offenses six times, some of the convictions having occurred in 1980, the same year as Floyd Williams' trial in this case. The trial court could justifiably conclude that this witness had a grudge against these women and was trying to get back at them, and that his testimony was completely unreliable.
Because Ellerby did not testify at the hearing, the defendant's burden to show that this witness' appearance at the trial would have affected the outcome of the proceedings (State v. Bucherie, 468 So.2d 229 (Fla. 1985)) was not carried. However, the trial court's findings in the order now under review as to the likelihood of an investigation locating Betts is equally applicable to Ellerby:
(d) The court finds that the likelihood that counsel, during pre-trial investigation, could have located unnamed and unidentified witnesses was so minuscule as to be virtually nonexistent. Counsel testified to his experiences as both a State Attorney Investigator and criminal defense lawyer, in which his efforts to locate and identify witnesses whose identities and whereabouts were unknown to him were fruitless, and it appears to the court that such efforts are a waste of time. For example, the defendant's witness Andrew Betts, both in his affidavit attahed [sic] to the defendant's motion and in his testimony at the hearing, stated that if an investigator had "come to the streets of Palatka and talked to me, I would have talked." However, the witness' name was never furnished to counsel by the defendant nor mentioned in the discovery materials furnished by the State. The defendant suggests that Mr. Betts would have been found by combing the streets of the city at random. Such a suggestion is untenable. Andrews Betts could not have been found by the most diligent investigation, unless the defendant had furnished his name, or the witness had come forward voluntarily. Moreover, with respect to his usefulness as a witness for the defense, counsel testified that if he had in fact found and interviewed Betts, he would not have used him at trial because he feared the type of information which would have been disclosed on cross-examination concerning Betts' relationships with the victims, and his own character and reputation, as was revealed in his affidavit and testimony. The court will not use hindsight *1129 to second-guess counsel's strategy, and so long as it was reasonably effective, which it was, it can not be faulted. Therefore, the defendant has failed to carry the burden to show that this specific omission or overt act was a substantial and serious deficiency measurably below that of competent counsel.
Somehow, the vision that Betts, with his criminal record, would have made himself known to the police or an investigator in 1980 had someone roamed the streets of Palatka looking for a witness, is difficult to conjure up.
Finally, the majority's agreement that Vivian's testimony was admissible, in my opinion, shuts the door on Williams' ineffectiveness claim, because that testimony was damaging and was apparently believed. Vivian testified that the night after Lola claimed she was attacked, she met Williams at the Inn. He was looking for Lola. Vivian agreed to accompany Williams in his car, to look for Lola at another nearby bar. On the way, Williams asked her if she had seen Lola that day. Vivian said she had seen her from a distance, and she appeared to be limping. Williams replied that "... I damn near broke her foot last night." Then he said, "When you see her tomorrow, you can tell her that I did the same thing to you that I did to her." Vivian then testified that Williams then took her to the same deserted area where he had taken Lola, made her take her clothes off and raped her twice in the car.
Obviously trial counsel's strategy did not work, but if that alone determines "ineffectiveness" from a legal standpoint, many defendants would be standing in line waiting for new trials. Neither is it a sign of ineffectiveness that counsel advised the defendant not to testify. The trial court found that this was good advice in this case and that the defendant hurt his case by insisting on taking the stand. For example, it gave the State the opportunity to bring out the fact that Williams was a twice convicted felon, on parole at the time of the incident; that he had a "lid" or sandwich bag of marijuana with him when he met, according to his story, Lola and Vivian, and that they smoked three "joints" during the time they were together. With regard to this complaint the trial court found that
the defendant insisted on taking the witness stand and testifying in his own behalf at trial, contrary to counsel's advice to him at the time, that he should not do so. There is direct and irreconcilable conflict between the testimony of the defendant and of counsel on this point. Defendant testified that after the State had concluded its case-in-chief at trial, he and counsel discussed the matter of whether or not defendant should take the stand, and that counsel advised him it would be best if he did testify in his own behalf. Counsel testified that he advised the defendant not to testify at trial, because sufficient reasonable doubt had already been injected into the trial at that point. Counsel further advised the defendant he would do his case harm by taking the stand, and that he would be cross-examined by a "superior prosecutor." Counsel added that on cross-examination, the prosecutor hurt the defendant "badly". With that assessment the court agrees. As to the conflict in testimony between the two protagonists, the court believes and accepts the testimony of counsel as being true, and rejects the conflicting testimony of the defendant as being untrue and unworthy of belief. It is a well-established principle of law that a defendant in a criminal trial has an absolute and fundamental right to testify in his behalf. In so doing he may freely disregard his lawyer's advice to the contrary. But having elected to exercise his right to testify, contrary to advice, the defendant should not now be heard to complain that he made a mistake.
The trial court found that each ground asserted by defendant involved counsel's judgment on matters of trial strategy which was reasonably effective based on the totality of the circumstances, Songer v. State, supra, and it is not our place to second guess that judgment. See also Downs v. State, 453 So.2d 1102 (Fla. 1984). In second guessing trial counsel's strategy, *1130 the majority opinion is in direct conflict with Strickland, Songer, Downs and other similar decisions. I would affirm.
NOTES
[1] § 90.404(2)(a), Fla. Stat. (1979).
[2] Attorney Susan Cary of Florida Institutional Legal Services, Inc., is to be commended for her diligent work in preparing the 3.850 motion in this cause.
[3] Our repudiation of that strategy is not a usurpation of the function of the trier of fact, as contended by the dissent. In this case, there are no disputed facts as to the admitted omissions of trial counsel. It is fundamental that the issue of the effectiveness of counsel, based on undisputed facts, is one to be resolved by a court as a matter of law. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[4] In fact, the only physical evidence of injury was that to the back of Floyd's head, where Vivian admittedly struck him with a tire iron.
[5] Section 90.404(1)(b)1., Florida Statutes (1979), states as follows:

(1) CHARACTER EVIDENCE GENERALLY.  Evidence of a person's character or a trait of his character is inadmissible to prove that he acted in conformity with it on a particular occasion, except:
* * * * * *
(b)Character of victim. 
1. Except as provided in s. 794.022, evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the trait; or
* * * * * *
(NOTE: Section 794.022 deals with prior consensual sexual activity between the victim and other persons, not prior acts of violence by the victim.)
[6] The dissent's contention that we have reweighed the evidence obviously cannot apply to evidence that the trial court refused to hear, even though we directed that it do so.
[7] Despite the dissent's challenge to this statement, the record shows that Attorney Cary obtained ten witnesses (live and in affidavit form) in preparation for the 3.850 hearing, as opposed to trial counsel's inability to obtain any during the entire trial preparation  and that Cary went directly to the Pine Street Inn, whereas trial counsel never knew where it was, not even at the time of the 3.850 hearing (he testified it was in northwest Palatka). Moreover, Cary's quest for these witnesses occurred years after the incident with a cold trail.
[8] Our mandate for a new trial herein could also be predicated upon an appellate court's inherent authority, based upon its review of the record, to correct a fundamental injustice. See Tibbs v. State, 397 So.2d 1120, 1126 (Fla. 1981), affirmed, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); Robinson v. State, 462 So.2d 471, 477 (Fla. 1st DCA 1984), review denied, 471 So.2d 44 (Fla. 1985).
[9] The dissent asserts that the jury's acceptance of Vivian Shingle's adverse testimony forecloses any claim of ineffective assistance of counsel  but the converse is true: An adverse jury verdict, far from rebutting such a claim, is an indispensable element of that claim. Otherwise, the issue would be moot.
[1] Appellate courts should not intrude into the fact finding province of the trier of fact. Dellinger v. State, 495 So.2d 197, 199 (Fla. 5th DCA 1986), Cobb, J., concurring.
[2] See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[3] Note the statement in the majority opinion that Attorney Cary found essential witnesses "with relative ease." This is pure speculation, with absolutely nothing in the record to support it.